UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| LAVITA L. BOARD, | : | Case No. 1:21-cv-149 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| UNION SAVINGS BANK, | : | |
| | : | |
| Defendant. | : | |

ORDER GRANTING SUMMARY JUDGMENT

This civil case is before the Court on a motion for summary judgment by Defendant Union Savings Bank ("USB") (Doc. 15), and the parties' responsive memoranda (Docs. 17 and 18). Also before the Court is Defendant's motion to stay discovery. (Doc. 16). Given the Court's decision in this Order, Defendant's motion to stay discovery is denied as moot.

### I.  BACKGROUND

Plaintiff Lavita Board owns a home in Cincinnati, Ohio. (Doc. 15-1 at ¶ 1). In August 2011, she mortgaged her property to secure a loan from Defendant USB. *Id.* at ¶ 2. In late 2014, Plaintiff faced financial struggles and fell behind on her mortgage payments. *Id.* at ¶ 3. She and USB executed a Loan Modification Agreement ("LMA") in May 2015. The LMA capitalized the outstanding delinquent interest, brought the mortgage payments current, and reduced Plaintiff's monthly loan payments. *Id.* at ¶ 4. But Plaintiff's financial issues continued. On June 18, 2015, she filed for bankruptcy. *Id.* at ¶ 6. Nearly five years later, Plaintiff completed her Chapter 13 Bankruptcy Plan

payments, and a United States Bankruptcy Judge for the Southern District of Ohio entered a Discharge Order. *Id.* at ¶ 7. Thus, by April 2020, Plaintiff was current on her mortgage payments. *Id.* at ¶ 8. When she received her first two mortgage statements after the Discharge Order, however, Plaintiff believed that USB had misapplied her April and May 2020 mortgage payments. *Id.* at ¶ 9. To date, Plaintiff has never explained why she believed her mortgage payments were misapplied. Instead, Plaintiff's complaint focuses on a series of communications her counsel had with USB.

On May 8, 2020, Plaintiff asked her lawyer at DannLaw to investigate the April and May 2020 mortgage statements. (Doc. 17-2 at ¶ 19).

**Letter #1:** On May 19, 2020, Plaintiff's counsel sent their first letter to USB. Letter #1 purported to be a Notice of Errors ("NOE") under Regulation X of the Real Estate Settlement Procedures Act ("RESPA"). (Doc. 15-1 at ¶ 10). It alleged three errors: (1) that USB had miscalculated the increase in Plaintiff's monthly escrow payment, and that USB failed to apply Plaintiff's (2) April and (3) May 2020 mortgage payments. *Id.* Letter #1 also purported to be a Request for Information ("RFI") under RESPA. *Id.* It sought a "life of loan transaction history" from July 2015 through Mary 19, 2020, and a payoff statement. At her deposition, Plaintiff could not recall if she ever saw Defendant's response to Letter #1. *Id.* She testified that "after hiring Dann Law, [she] deferred to Dann." (Doc. 13 at 47:18-23). She effectively told her lawyers, "[C]an you just handle it because I'm tired and my eyes are crossing. I don't know what I'm looking at anymore." *Id.*

2

**Letter #2:** On June 8, 2020, Plaintiff's counsel sent another RFI, this time drawing authority from both RESPA and the Truth in Lending Act ("TILA"). The RFI sought information related to the identity and contact information of the loan servicer, and against requested a payoff statement. (Doc. 17-2 at ¶ 12). Plaintiff could not say if she ever received the information requested in Letter #2. *Id.* at ¶ 13.

**Letter #3:** Plaintiff's counsel sent a third letter ("Letter #3") also on June 8, 2020. Letter #3 also contained an RFI. *Id.* at ¶ 14. Letter #3 made thirteen detailed requests for documents related to Plaintiff's mortgage. *Id.* Again, Plaintiff could not say if she ever saw a response to Letter #3 because she "let … Dann Law handle everything at that point." (Doc. 13 at 51:3-6). She "admit[ted]" at her deposition that she "deferred to Dann Law on everything and kind of tried to put it out of [her] mind." *Id.* at 54:13-15.

**Response #1:** On June 30, 2020, USB responded to Plaintiff's counsel for the first time. Response #1 contained the loan history and a payoff statement satisfying the information requested in **Letter #1** and part of **Letter #2**. (Doc. 17-1 at ¶ 17).

**Letter #4:** On July 21, 2020, Plaintiff's counsel sent a fourth letter ("Letter #4"). Letter #4 contained an NOE under Regulation X of RESPA. The letter alleged USB had made an error by failing to respond to Letter #2.

**Response #2:** On August 4, 2020, USB sent Plaintiff's counsel a blank email—without any body text—attaching dozens of documents, including annual disclosures, several years of escrow analysis, default servicing records, and annual borrower statements. *Id.* at 22. USB's email did not attempt to identify as to which requests these documents were responsive. (Doc. 13-13 at 1).

3

**Letter #5:** On August 20, 2020, Plaintiff's counsel sent USB another letter again containing an NOE. The alleged error was USB's failure to response to Letter #3 and the errors Plaintiff identified in Letter #1.

**Response #3:** On September 10, 2020, USB emailed Plaintiff's counsel acknowledging Letter #5 (which alleged errors in responding to Letter #3). *Id.* at ¶ 26. USB's representative, apparently seeking clarification, asked Plaintiff's counsel to "advise what documentation [wa]s still outstanding [from the requests in Letter #3] so that [they could] expedite [their] review." (Doc. 13-13 at 2). After Plaintiff's counsel did not respond, USB sent another email on September 21, 2020, again asking USB to "advise what documentation [wa]s still outstanding." (Doc. 17-1 at ¶ 27). Plaintiff's counsel replied to this email on the same day identifying the items that USB had produced and referring USB's representative to outstanding items identified in Letter #5. *Id.* at ¶ 28. The email stated Plaintiff was "more than amenable" to "an extension to go back through the records and produce by sometime in October." *Id.*

**Response #4:** On October 21, 2020, USB's representative responded to Plaintiff's counsel, this time with "specific responses to each item in [Letter #5]," (which repeated the outstanding requests from Letter #3). *Id.* at ¶ 29. Plaintiff does not dispute that Response #4 provided the items Plaintiff requested in Letter #3. *Id.* at 13, ¶ 25. Instead, Plaintiff takes issue with USB's failure to expressly address her counsel's Notices of Error. *Id.* at ¶26.

In sum, Plaintiff does not allege that USB never provided the information requested in Letters #1 and #3. (*See* Doc. 1 at ¶ 51). And, despite receiving the

4

information she requested and completing full discovery in this litigation, Plaintiff does not allege in her complaint that USB made an error in servicing her loan. *See id.* at ¶ 54. Her complaint rests RESPA and TILA liability entirely on USB's failure to respond to Plaintiff's NOEs in Letter #1, #4, and #5, and its delayed responses to RFIs in Letters #2 and #3. She seeks damages based on (1) the expense of sending Letters #1-#5 and (2) her "stress, anxiety, and anger" while corresponding with USB. *Id.* at ¶¶ 28-29.

## II. STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.

### III. ANALYSIS

#### A. Article III standing for statutory violations

Defendant's sole basis for summary judgment is its belief that Plaintiff lacks an injury-in-fact conferring Article III standing. Article III confines judicial power to the resolution of "Cases" and "Controversies." *Raines v. Byrd*, 521 U.S. 811, 820 (1997). To have a case or controversy under Article III, a plaintiff must have a "personal stake" in the case. *Id.* In other words, a plaintiff must show that (i) that she suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992). If a plaintiff "does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve." *TransUnion v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).

In recent years, the Supreme Court and Sixth Circuit have made clear that a plaintiff cannot automatically satisfy Article III's injury-in-fact requirement "whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Ward v. National Patient Account Services Solutions, Inc.*, 9 F.4th 357, 361 (2021) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 136 S. Ct. 1540, 1543 (2016)). In *TransUnion v. Ramirez*, the Supreme Court reaffirmed this principle as applied to a federal consumer finance statute, the Fair Credit Reporting Act. 141 S. Ct. 2190 (2021). Like TILA and RESPA, the Fair Credit Reporting Act authorizes damages for failure to comply with the act's procedural requirements. *Id.* at 2201. To satisfy

6

Article III, Plaintiff must show that Defendant's procedural violation under the statute "is a concrete injury of the sort traditionally recognized or that the procedural violations caused an independent concrete injury." *Id.*

Here, Defendant argues both that Plaintiff's alleged injuries are not traceable to Defendant's conduct, and that Plaintiff's alleged harm is not a "concrete" injury. For an injury to be concrete, the Supreme Court instructs that "that courts should assess whether the alleged injury to the plaintiff has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *Spokeo*, 578 U.S. at 341. This inquiry looks to "history and tradition" to "offer a meaningful guide to the types of cases that Article III empowers federal courts to consider." *Sprint Communications Co. v. APCC Services, Inc.*, 554 U.S. 269, 274 (2008). Thus, plaintiffs must "identif[y] a close historical or common-law analogue for their asserted injury. *TransUnion*, 141 S. Ct. at 2240. Tangible harms, such as physical or monetary injuries, are the most obvious concrete injuries under Article III, but intangible harms may also give rise to an injury-in-fact. *Id.* (citing as examples reputational harms, invasions of privacy, infringements of fundamental rights).

Congress can offer courts some guidance on which harms are sufficiently concrete to qualify as an injury in fact. *Spokeo*, 578 U.S. at 341. Through legislation, Congress may "elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." *Id.* at 341 (citing *Lujan*, 504 U.S. at 562–563, 578). But Congress "may not simply enact an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is." *Hagy v.*

7

*Demers & Adams*, 882 F.3d 616, 622 (6th Cir. 2018) (referring to procedural rights under another consumer finance statute, the FDCPA).  Thus, "Congress's creation of a statutory prohibition or obligation and a cause of action does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III." *TransUnion*, 141 S. Ct. at 2205.

Following *TransUnion*, federal courts have split on whether bare procedural violations of consumer finance statutes, including RESPA and TILA, constitute "concrete harm" satisfying Article III's injury-in-fact requirement, even where Congress has ostensibly provided a cause of action.  Every circuit court that *has* applied *TransUnion* to RESPA or TILA concludes that procedural violations of those statutes *do not* automatically confer standing.  *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 254 (4th Cir. 2020) (no standing for bare procedural violations of RESPA); *Schwartz v. HSBC Bank USA, N.A.*, 750 F. App'x 34, 36 (2d Cir. 2018) (no standing for violation of notice requirements of TILA); *Mejia v. Ocwen Loan Servicing, LLC*, 703 F. App'x 860, 864 (11th Cir. 2017) (no standing to seek damages for failure to comply with RESPA procedural requirement); *Meeks v. Ocwen Loan Servicing, LLC*, 681 F. App'x 791, 793 (11th Cir. 2017) (no standing to seek damages for defendant's failure to timely acknowledge RFI).

Though the Sixth Circuit has not yet decided how *TransUnion* impacts standing under TILA or RESPA specifically, our circuit is generally inhospitable to Plaintiffs

8

alleging a bare procedural violation of a federal consumer finance statute.[1] Thus, this Court holds that bare procedural violations of RESPA or TILA are not, on their own, sufficiently concrete to satisfy Article III's injury-in-fact requirements.[2] To bring a claim for damages for procedural violations under those statutes, a plaintiff must show that Defendant's procedural violation *concretely harmed* her, meaning the alleged injury is closely related to a harm traditionally providing a basis for a lawsuit in American courts, or that the procedural violation "caused an independent concrete injury." *TransUnion*, 141 S. Ct. at 2207; *Ward*, 9 F.4th at 361.

Plaintiff's allegations are all related to USB's failures to respond to her NOEs and timely provide the information her RFI's requested. These are bare procedural violations of RESPA' Regulation X and, in Letter #2's case, TILA. 12 C.F.R. §§ 1024.35(d), (e); 12 U.S.C. §§ 2605(e) and 2605(k) (Counts I, II, and III; RESPA); 15 U.S.C. § 1639g and 12 C.F.R. § 1026.36(c)(3) (Count IV; TILA). Thus, to have standing, Plaintiff must demonstrate that these procedural violations are themselves "concrete injur[ies] of the sort traditionally recognized or that the procedural violations caused an independent

---

[1] *See Thomas v. TOMS King (Ohio), LLC*, 997 F.3d 629, 640 (6th Cir. 2021) (no standing for procedural violation of the Fair and Accurate Credit Transactions Act); *Beaudry v. TeleCheck Servs., Inc.*, 854 F. App'x 44, 45-46 (6th Cir. 2021) (no standing for procedural violation of Fair Credit Reporting Act); *Huff v. TeleCheck Servs., Inc.*, 923 F.3d 458, 463-65 (6th Cir. 2019) (same); *Ward v. National Patient Account Servs. Sols., Inc.*, 9 F.4th 357, 362 (6th Cir. 2021) (no standing for Fair Debt Collection Practices Act); *Garland v. Orlans, PC*, 999 F.3d 432, 438 (6th Cir. 2021) (same); *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 865 (6th Cir. 2020) (same even where plaintiff alleged the procedural violation caused him anxiety); *Hagy*, 882 F.3d at 622-23 (6th Cir. 2018) (same); *Lyshe v. Levy*, 854 F.3d 855, 860-61 (6th Cir. 2017) (same).

[2] Plaintiff resists this holding by citing a handful of district court case cases that permit standing based on bare procedural violations. These cases are not persuasive. They are invariably outside the Sixth Circuit, and nearly all of them predate *TransUnion*.

9

concrete injury." *Ward*, 9 F.4th at 361.

Plaintiff makes no argument that the procedural violations were themselves concrete injuries of the sort traditional recognized. *See* Doc. 17 at 8-12. Instead, Plaintiff argues only that USB's failures *caused* "independent concrete injury." She argues that the USB's failure to respond to the NOEs perpetuated her payment of erroneous escrow fees. She argues that she incurred attorney fees and costs to send USB the RFIs and NOEs. (Doc. 17-1 at 14, ¶ 28). She also cites her "stress, anxiety, and anger" at having to pursue the NOEs and RFIs. *Id.* at 14, ¶ 29. Construing all facts and inferences in a light most favorable to Plaintiff, these results, though certainly vexatious, are not enough to establish that USB's procedural violations caused an independent concrete injury.

a. Plaintiff has not supported her claim for excess escrow costs

Plaintiff asserts that USB erroneously increased her monthly escrow fees and that USB's failure to respond to her NOEs caused her to continue paying excess escrow fees. She does not, however, support this assertion with any facts. Plaintiff (through her counsel) received the account history she requested. (Doc. 17-1 at ¶ 16). She also received several escrow analyses covering every year from 2016 through 2020 (Doc. 13-13 at 1). And, in the course of this litigation, she has had the full suite of federal discovery tools at her disposal. None of these apparently supplied Plaintiff any facts suggesting that the escrow increase was incorrect. To defeat summary judgment, Plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To rely on miscalculated escrow payments as a basis for concrete injury, Plaintiff

10

had to "come forward with specific facts showing that" the validity of her escrow fees are "a genuine issue for trial." *Id*. at 587. She has not met that burden.

### b. The cost of pursuing compliance is not a concrete injury

Next, Plaintiff argues that the costs and attorneys' fees she incurred to have her counsel send the Letters containing RFIs and NOEs count as a concrete injury flowing from USB's procedural violations of TILA and RESPA.[3] Precedent in the Sixth Circuit forecloses this argument. In *Ward v. National Patient Account Services*, Defendant NPAS made collection calls in violation of the procedural requirements of the FDCPA. 9 F.4th 357 (6th Cir. 2021). Like RESPA and TILA, the FDCPA provides a private cause of action for borrowers to vindicate procedural rights under the statute. *See id.* Ward hired counsel to send NPAS a cease-and-desist letter and later to pursue litigation against NPAS. *Id.* at 363. Ward argued that his concrete harm was "the economic expense of retaining counsel." *Id.* The Sixth Circuit rejected this argument. "If the voluntarily incurred expenses of bringing a suit could be used by themselves to show concrete injury, this element of Article III standing would always be satisfied by any plaintiff who incurs legal expenses." *Id.* Likewise, Plaintiff here cannot claim that her costs to hire counsel to send seven letters to USB counts as a concrete injury-in-fact.

Plaintiff attempts to distinguish *Ward* by pointing out that Plaintiff "did not hire her attorneys to affirmatively pursue the instant matter *in federal court*, but instead to request information and most importantly correct the errors with USB's application of her

---

[3] As to "she incurred, it is more accurately stated as "her counsel incurred." Plaintiff testified at her deposition that she has not paid her attorneys anything yet. (Doc. 13 at 79:1-8).

monthly payments." (Doc. 17 at 11) (emphasis supplied). But that distinction did not exist in *Ward*. Like Plaintiff, Ward initially hired his attorney to send his creditor a letter correcting what he perceived as a mistake. *Id.* at 360, 363. The Sixth Circuit's language was not limited to attorneys' fees generated in litigation. The appellate court broadly observed that "applying Ward's logic to any plaintiff who hires counsel to affirmatively pursue a claim would nullify the limits created under Article III." *Id.* at 363. Following the Sixth Circuit's instruction, this Court cannot find that Plaintiff has established standing merely by paying her lawyers to send letters on her behalf.[4]

    c.   <u>Stress, anxiety, and anger is not a concrete injury</u>

Plaintiff's third argument is that USB's failure to respond to her letters containing NOEs caused her stress, anxiety, and anger which constitute a concrete injury-in-fact.[5] In other words, Plaintiff seeks to establish that USB's procedural violation caused her an emotional injury that confers standing.

For an emotional injury to confer standing it must bear a "close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *Spokeo*, 578 U.S. at 341. Courts look to "history and tradition" to "offer a meaningful

---

[4] Separately, Plaintiff argues that her costs to send USB the Letters provide a basis for standing under *Marais v. Chase Home Fin., LLC*, 24 F. Supp. 3d 712, 728 (S.D. Ohio 2014). But that case did not address standing. The plaintiff in *Marais* had already established standing (under pre-*TransUnion* rules), and could therefore "metamorphose[]" the costs of sending letters into her damages calculation. Plaintiff cannot employ the *Marais* case to escape the principle that "interest in attorney's fees is, of course, insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 480 (1990).

[5] Plaintiff abandoned her arguments the USB's failure to respond to letter containing *RFIs* caused her emotional distress. (Doc. 17 at 12 n.1).

12

guide to the types of cases that Article III empowers federal courts to consider." *Sprint Communications Co. v. APCC Services, Inc.*, 554 U.S. 269, 274 (2008). In the Sixth Circuit, "[s]ome forms of anxiety or emotional harm are cognizable under the common law, but others are not. And this distinction appears to turn on both the defendant's conduct giving rise to the anxiety and the anxiety's severity." *Garland v. Orlans, PC*, 999 F.3d 432, 439 (6th Cir. 2021).

In *Buchholz v. Meyer Njus Tanick, PA*, the plaintiff alleged a procedural violation of the Fair Debt Collection Practices Act ("FDCPA") caused him anxiety which gave him standing to sue. 946 F.3d 855 (6th Cir. 2020). The Sixth Circuit expressed skepticism that a bare allegation of anxiety could form an injury-in-fact. The Court explained that "closest common-law analogues about 'psychological injuries' emphasize the 'extreme' or 'outrageous' nature of the underlying conduct causing the harm." *Garland*, 999 F.3d at 439 citing *Bucholz*, 946 F.3d at 864. A creditor's failure to conform to the procedural requirements of a federal consumer finance statute is not "extreme" or "outrageous" enough to convert a plaintiff's anxiety into a cognizable injury in fact. *Id.*

Here, Plaintiff makes no argument that her emotional distress is tied to a "harm traditionally recognized as providing a basis for a lawsuit in American courts." *Spokeo*, 578 U.S. at 341. Accordingly, the Court cannot find that Plaintiff's anxiety,[6] without

---

[6] Plaintiff also alleges "anger" and "stress" but the Court sees no meaningful distinction between these emotional harms. Restatement (Second) of Torts § 46 (1965) ("Emotional distress passes under various names, such as mental suffering, mental anguish, mental or nervous shock, or the like. It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea.").

13

more, constitutes an injury-in-fact.

USB also argues that Plaintiff failed to establish another element of standing: traceability. Because the Court is persuaded that Plaintiff cannot establish that her emotional distress constituted an injury-in-fact, the Court need not reach traceability.[7]

Construing all facts and inferences in a light most favorable to Plaintiff, the Court cannot conclude that Plaintiff has suffered a concrete injury-in-fact. She therefore lacks standing to pursue her claims against USB. To be sure, this holding is not a hall pass for creditors to ignore their borrowers' notices of errors or requests for information. USB's lackadaisical emails are hardly a model of customer service. (Doc. 13-13). In this case, both parties lucked out. Plaintiff was not concretely injured by USB's failure to respond to her NOEs. But if, for example, Plaintiff had presented any "specific facts" suggesting that her escrow increase was genuinely erroneous and that she continued to pay too much because of USB's failure to investigate and correct the error, this might have been a very different Order. *Matsushita*, 475 U.S. at 586.

---

[7] Plaintiff's response brief also claims she is entitled to statutory damages for USB's "pattern or practice" or failing to respond to borrowers NOEs and RFIs. Plaintiff does not explain how this claim rebuts USB's argument that she lacks standing. In any event, Plaintiff presents no facts suggesting that failing to respond to borrower letters was its "standard operating procedure." *Lewis v. PNC Bank, N.A.*, No. 3:17-CV-220, 2018 WL 6249989, at *8 (S.D. Ohio Nov. 29, 2018). Proving a "pattern or practice" requires "evidence that Defendant failed to investigate and respond reasonably to qualified written requests from other borrowers" besides Plaintiff. *Id.* Plaintiff offers none.

14

## IV. CONCLUSION

Based upon the foregoing, Defendants' motion for summary judgment (Doc. 15) is **GRANTED**. The Clerk shall enter judgment accordingly, whereupon this case is **TERMINATED** from the docket of this Court.

**IT IS SO ORDERED.**

Date: 4/25/2022

*s/Timothy S. Black*
Timothy S. Black
United States District Judge